May it please the Court. Arthur Catterall of the Justice Department, representing the United States. And I believe I've requested two minutes of rebuttal. The district court in this case erroneously held that Temsco's tour helicopters were not operated on established lines and therefore qualified for the small aircraft exemption to the federal excise tax on transportation by air. Now the controlling regulations provide that the term operated on an established line means operated with some degree of regularity between definite points. And the regulations further provide that the term implies that the service provider retains control over the particulars of the flight. And we maintain that the district court misapplied each of these factors. On the regularity factor, the court effectively held that a carrier cannot operate with some degree of regularity unless it has a published schedule. In other words, the court effectively held that de facto regularity, that is regularity of operations based on predictable customer demand, will never suffice, even though the regulation specifically provides that strict regularity of schedule need not be maintained. Well, doesn't the record show without dispute that there is no published flight schedule, that the actual conduct of its glacier  There certainly is no published schedule. Their FAA certificate does not allow them to publish a schedule. And so it strikes me that whenever you don't have a published schedule, then sort of by definition, your schedule is based on customer demand. And the district court seemed to latch on to that fact, that because the schedule was based on customer demand, you couldn't have the regularity operated with some degree of regularity. So what in the facts would contradict that? Well, the facts would indicate that there was de facto regularity, and that is that during the summer tourist season in Alaska, which I believe is May to September, pretty much every, on the hour, the quarter hour, and the half hour, Temsco was running these tours pretty much five days a week because you had numerous cruise lines in and out of port. And so there was a steady stream, a steady predictable stream of passengers, and they would coordinate with the cruise lines months in What's the effect of the FAA regulation? Because they can't have a published schedule. Right. It has no effect. I mean, it's irrelevant for tax purposes. There is a revenue ruling that came out in the 70s that makes that clear, and I believe in their brief, Temsco acknowledges that the FAA certificate has no relevance to the tax issue. What's the difference between this case and the Colorado case where the judge ruled the other way? Well, in my view, and actually I think it was a Nevada case. Nevada. But it was the Grand, yeah. In that case where the court held that aerial tours of the Grand Canyon were operated on an established line, in my mind, the facts of that case were much less favorable to the government than the facts of this case, and it's the Lake Mead Air case. And in that case, you had a much lesser degree of regularity. They only did two flights a day, one in the morning, one in the afternoon. And also, to the extent that customer demand, this idea of customer demand, creates a problem in terms of regularity of schedule. The bulk of the customers in the Lake Mead Air case were provided by a single tour company, whereas here, we've got numerous cruise lines coming in and out of port all summer. So, again, it's a much more predictable customer demand in this case. So, in my mind, the Lake Mead Air case was probably a closer call than this case. Did the IRS mislead the airlines by the letter that was written, the agent's letter saying the tax didn't apply? The IRS certainly was not as careful as it should have been when it issued that letter. And, you know, again, we can debate exactly what the letter meant and what the context of the letter was, but it seems to me that at some point, you know, the taxpayer has to shoulder some of the burden of determining what its correct excise tax obligations are. Well, if the IRS says to you, and you've thought about this for a couple of years, and then the IRS sends you a letter and says, okay, from now on, you do it this way, and so from now on, you do do it this way, and then the IRS comes and says, I want to quit doing it that way, and I'm going to assess you. Not only that, but I'm going to make it hard on you. It seems to me that this is a case for the IRS to at least try to settle. Say, why don't you just forget all these other years where you could have relied on what we said, and then from now on, do something. Well, the thing is, going forward, these types of tours are exempt from the tax. All right. Amen. Congress changed the law. I'm sorry? Congress changed the law? Yes. Yes. Congress changed the law in 2005, and we are concerned with the years 2002 through 2004. One point I'd make about it. I think that change indicates that Congress thought that it was never taxable. I respectfully disagree. You had a statement from one of the Senators, a floor statement, saying that Congress always, this confirms what Congress always intended, but this provision was enacted in 1958. A Senator speaking in 2005 cannot confirm what the Congress in 1958 was thinking. It depends on the Senator and what he thinks, I guess. Well, there you go. There you go. Even if you're correct that the IRS can change its audit position, wouldn't the fact of the 1994 letter bear on your ability to seek a penalty, a willful violation? I will say this, that there are provisions in the code that allow a taxpayer to request that the IRS abate penalties and interest, and there are procedures where, you know, under certain circumstances, if the IRS refuses, you can go to court. So that's an option available to Temsco. Well, but that's what, I mean, if, even if you were correct on the rest of the stuff, the issue of penalty and the issue of credit for the fuel tax paid would still be live, wouldn't it? Absolutely. For the district court? Absolutely. And we're asking that the case be remanded to, so that. I understand. Why don't you just take it to mediation? That was going to be my next question. Well, I guess. I mean, it's just, okay. It's just a question. You know, I don't know what the district court of Alaska's mediation procedures are. No, I'm talking about ours. We've got an extremely effective one. We've got some good mediators who'd love to get this done. And, you know, it's interesting because there's a related case called North Star Trekking that did get selected for mediation, but this case did not get selected for mediation. Well, we can select it. I understand. I understand. Okay. If possible, I'd like to. Let me ask you this one last question. Assuming without conceding that they were subject to the tax, do I need to remand this to determine whether the government can recover the amounts at issue? No, you need to remand so that we can determine the precise amount of the liability. Well, but there are some regulations which should have been adopted and haven't been, and that issue was not discussed by the district court. And so it seems to me that in that situation, maybe I ought to remand to even suggest whether you can collect in any event since the regulations have never been issued. That is certainly one path to go, but since it's purely a legal issue as to whether those regulations are necessary to make the statute operative, this court can make that call as well. But summary judgment went against you on the legal question. You never got to the factual issues. Isn't that right? To the issue of whether? You lost on summary judgment on the legal question before the district court. We lost on the issue of whether the flights were subject to the tax, and so the court never reached the issue of if they are subject to the tax, can we collect it from? Right. That was never resolved, or how much it would be. Right. And the issue of whether we can collect, I believe, is purely a legal issue that this panel, if it so chooses, could determine. The issue of the precise amount, you know, credit for fuel taxes paid and backing out, you know, amounts that weren't related to the transportation per se, that's appropriate for remand. Isn't your best argument that this statute applying to helicopters really tracks the practice that was applied to limousines and traveling between airports and hotels? And those cases are the cases that support your position. I certainly think that the history of the exemption is very enlightening and helpful. If you look that way, if you look at the legislation and you look at what happened in Congress, you might get a different viewpoint of the case. Are you referring to the 2005? Yes. Yeah. I mean, in my mind, you know, Congress decided, look, we don't want these types of operations to be subject to the excise tax. I don't think Congress made any kind of – in fact, the committee reports sort of lay out what the current law is and make no indication of, you know, we think the IRS is wrong. So the Nevada case came before the legislation changed. Correct. So Congress knew about the Nevada case. Correct. Correct. Okay. Thank you. Do I – You're in deficit spending. Do I get any rebuttal or – Probably not. Okay. All right. Good morning, Your Honors. My name is Leonard Feldman. I'm counsel for the Appellee Tempsco Helicopters. Mr. Catterall made an interesting remark. He said we could debate what the meaning of the 1994 letter from the IRS means. I don't think there's any room for debate. What the IRS said in that letter is that Tempsco Helicopters is no longer in the business of providing transportation that's subject to the transportation tax. So pay the fuel tax. Not only pay the fuel tax, but they revoked Tempsco's registration, which would have allowed Tempsco to continue to buy fuel without paying the fuel tax. So the IRS didn't just tell Tempsco to pay the fuel tax. They absolutely dictated that Tempsco pay the fuel tax. And everybody agrees that you pay the fuel tax or the transportation tax. What did they revoke? The registration. For what? Which allowed Tempsco to purchase fuel without paying the fuel tax. I see. Because they were paying the transportation tax. They had the registration, which allowed them to avoid paying the fuel tax, which also required it. What was the assessment that what was the procedure that was underway that generated that letter? I don't know the answer to that, Your Honor. I don't know if it was a – The letter was written by a very low-level person in the IRS office, right? It was not written by a low-level person at the IRS. It was written by somebody who was in charge of that particular division in Alaska. Doesn't the existence of the letter go primarily to whether you could possibly have been willful in violating sanctions? I think it goes to several issues in this case. I mean, one issue that it goes to is that what we're asking this court to do, which is what the district court did, is agree with what the IRS said in 1994. So in other words, that's an indicia that our argument is correct. But it also goes to prospectivity. It goes to willfulness. And it goes to the estoppel arguments, all of which we raise in our briefing. And as I think Mr. Catterall acknowledged, if we're successful as far as prospectivity or estoppel, Congress has done what the IRS has done previously as well. I mean, Congress in – Well, where is your affirmative misrepresentation? I mean, that's the problem, it seems to me, with an estoppel theory. The affirmative misrepresentation is that the government is now taking the position that Temsco's flights have always been subject to the transportation tax and not the fuel tax, and yet we have a representation from the IRS that says you should pay the fuel tax, and you have to pay the fuel tax. So I would – Well, but that was cool for you. I mean, you keep making that sound like it was bad. I mean, that saved you a ton of money. It did, and the company relied upon it, and that is the basis for the estoppel argument. How did you – okay, I mean – Well, the company relied upon it by paying the fuel tax for many, many years. I understand, which to me is a very compelling argument for why you shouldn't be subject to penalties for being willful. I mean, you had the letter. But why does that stop the government from changing its audit position? It doesn't, and I guess I want to be clear about that. The government can change its audit position. It can do so prospectively. The only argument that we're making, and you'll see from our briefing that we've coupled the retroactivity prospectivity argument on the one hand with the estoppel argument on the other because we think those are complementary legal doctrines in this case. Together, separately, regardless, it precludes the government from going back in time before the 2005 letter and assessing the fuel tax – or excuse me, the transportation tax. Okay. Pursuing a question that – or a line of thought that Judge Hart had a minute ago, I don't see a whole lot of wiggle room given the Gray Line case. Because if the limo service from downtown Portland to the airport were on a schedule, it seems to me that it's hard – you're hard-pressed to say that your helicopters weren't. Well, we distinguished that case in our briefing, and we did so on a number of – Well, I know, and it didn't strike me as being really overwhelming, so that's why I'm asking you now. Right. Well, you know, I'd go back to the arguments that we've made repeatedly, which is what happened here is that – and this is really the central flaw, I think, in the government's argument. They have essentially confused regularity – or excuse me, they've confused frequency, popularity, demand, on the one hand, with regularity on the other. The record shows very, very clearly and without dispute that these flights took off only when they were contracted to take off. And so there is no – Which was like four times an hour for four or five months. Right. But that just shows that it was in demand. That doesn't show that it was operated with any degree of regularity. That's very different. It's some degree of regularity. I mean, I admit this is all squishy, but, I mean, it's – in Gray Line, it was – what's the difference? Why are the helicopters less regular than the limos from the airport in Portland at Benson? I think the Gray Line case shows that there was, in fact, a schedule there and that there were a limited number of stops. And as we've pointed out, and I think this is something to keep in mind, there's a difference between a ground-based taxi service on the one hand and an air-based taxi service on the other. An air-based taxi service like Temsco's Glacier Flights has to take off and leave at certain locations and they can't all take off at the same time. They have to be staggered. And so what the record here shows is that Temsco said to the cruise companies, here's the maximum amount of flights that we can handle. And that was the allocation that was provided. There was no schedule, and as we've discussed or you've discussed with Mr. Catterall, Temsco couldn't provide a schedule because it wasn't certified to do so. And then the cruise companies started filling those flights. And yet at the same time, the record also shows that if people showed up late, the flights didn't take off without them, which I think is another distinction from the Gray Line case. Instead, the flights waited until the passengers were there. And if there weren't enough people to fill the flights, they didn't take off either. And so if you look at this from sort of the taxi-bus dichotomy, which those cases suggest, this is very much like a taxi. It was entirely driven by customer demand. And the district court, I think, had a nice way of putting this. What the district court said is to the extent there is a degree of regularity, it's not due to a regular schedule. Instead, any perceivable pattern is due to customer demand. The district court here, contrary to what Mr. Catterall said, wasn't hung up on whether there was or wasn't a schedule. The district court recognized that this is a 100 percent on-demand service, and that was what the testimony was. And the district court recognized that, as I said, if you perceive a pattern, which the government clearly has, that's not due to regularity, that's due to customer demand. And, you know, there's a number of revenue rulings that essentially say the same thing. We cited the helicopter or the scenic glider ride cases. I mean, there's a bunch of them. A service like that doesn't suddenly transform from being irregular or not on an established line to being on an established line just because a bunch of people show up. And that's all that we have here. So if you look at this from the taxi-versus-bus perspective, clearly we have a taxi. If you look at this through the eyes of the regulation that deals with regularity between definite points and control, once again, it's very clear that this is not operated on an established line. Well, I guess my worry about this, Counselor, is that, as I read the record, it seemed clear to me the aircraft worked off a fairly regular schedule. They had the possibility of changing the schedule due to the customer demand, but there was a fairly regular schedule where they left on regular intervals. Trips were planned. They were arranged months in advance and were coordinated. And so I'm still having trouble with gray lines. The record shows, Your Honor, that when customers didn't show up on time, the flights didn't leave on the quarter hour, the half hour, or the hour. The flights left when the customers were there and if there were enough customers to pay those flights to leave. The only indication that the flights left on an hourly quarter hour and half hour basis is that that was the allocation they provided to the cruise companies. But the evidence is unrebutted that the cruise lines show up late. The buses get delayed in downtown. They're selling flights throughout the night. There's cancellations. That's not like Alaska Airlines where you could get there on time and that flight's taken off and if you get there late, that flight took off without you. The Lake Mead Air case was a very different case. That provider there did have an established schedule and the record was very clear about that and there was no contract involved so there was no control on the part of the passengers in that case either. So we've, I think, discussed that at length and just briefly, I guess, by way of mediation, we did discuss mediation not in this particular case but in the North Star case which is a related case and I spoke with Mr. Catterall about whether this case ought to go to mediation and at the time, anyway, it was told that the government did not have any interest in doing so. Well, I was going to ask you the same question. It seems to me this is a mediatable case, especially since in front of us we can make all kinds of decisions here and so with both of you having your advantages or disadvantages, I think this is the time to get this done, especially when it doesn't make any difference anymore. Congress has changed things. Your Honor, if it's okay with the court, what we would do is meet and confer, figure out whether our respective clients are willing to go into mediation and let the court know within a week or two. Well, Judge Reimer, how do you feel about that? Sure, that would be fine. Okay. Thank you, Your Honor. Thank you. I did give him an extra minute 22. If you want 30 seconds, I'll hear it. I guess the one point I'd like to make, I'm not aware of any general principle that says when the IRS changes its audit position, it can only do so prospectively. That's just a function of whether the year is open or not, whether the statute of limitations is open or not. There are rules regarding when the IRS can retroactively revoke a published ruling or regulations or things like that, but as far as just an audit position, there's nothing that prevents the IRS from retroactively changing its position. And then also on the estoppel argument, again, I think the law is fairly clear that in order to estop the government, you have to have a showing of affirmative misconduct beyond mere negligence, which amounts to either a deliberate lie or a pattern of false promises, which we don't have in this case. Thank you very much. Case 09-35269 is submitted.
judges: Hart, Rymer, Smith N. R.